IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA  §
§        CRIMINAL ACTION NO. H-07-0338
v.                         §
§        CIVIL ACTION NO. H-10-4924
THANG DINH NGO            §

## MEMORANDUM OPINION AND ORDER

Defendant Thang Dinh Ngo, represented by counsel, filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. (Docket Entries No. 273, 274.) The Government responded and filed a motion to dismiss (Docket Entries No. 290, 291), to which Defendant filed a response (Docket Entry No. 296).

Based on consideration of the pleadings, the motion to dismiss and the response, the record, and the applicable law, the Court GRANTS the motion to dismiss and DENIES the section 2255 motion, as follows.

### Procedural Background and Claims

On June 11, 2008, Defendant pleaded guilty to conspiracy to possess with intent to distribute five kilograms or more of cocaine and methylenedioxymethamphetamine ("MDMA," or more commonly, "Ecstasy"), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846 (count one); aiding and abetting possession with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 and 18 U.S.C. § 2 (count two); and aiding and abetting possession

with intent to distribute MDMA, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846 and 18 U.S.C. § 2 (count three).  On November 19, 2008, the Court sentenced Defendant to 168 months in prison as to each of the three counts, to run concurrently, followed by five years' supervised release.  The convictions and sentences were affirmed on direct appeal.  (Docket Entries No. 246, 248.)

Defendant specifies the following three claims for relief in this section 2255 motion:

(1)    the Government suppressed exculpatory evidence material to sentencing and punishment, in violation of due process;

(2)    Defendant's sentence was based upon material false information, in violation of due process; and

(3)    the Government violated due process and the separation of powers doctrine by importing and delivering a load of MDMA that was ten times the quantity of the intercepted load, without Defendant's knowledge, for the purpose of enlarging his sentence.

Defendant claims that these errors entitle him to a new sentencing hearing.

### Factual Background

The "Offense Conduct" portion of the revised PSR reflects the following:

On July 6, 2007, at about 6:25 p.m., Customs and Border Protection Inspectors seized approximately 61 kilograms of suspected [MDMA] in Detroit, Michigan. It was subsequently learned the MDMA originated from Canada. Subsequent to the seizure, a confidential source (CS) advised agents with the Bureau of Immigration and Customs Enforcement (ICE) in Detroit, that the MDMA was destined to unknown individuals in Houston, Texas. The CS further stated that he/she was responsible for transporting the MDMA to Houston.  As a result, ICE agents who were assigned to the Houston, Texas, Narcotics Smuggling Group received information from their

2

counterparts in Detroit regarding a possible controlled delivery of the MDMA, to targets in the Houston area.

On July 8, 2007, the CS had a telephone conversation with an individual who identified himself as Number 33. The CS stated that Number 33 told him/her the CS should identify himself/herself as Number 11. Having been advised that the CS had not left Michigan with the MDMA, Number 33 told the CS he/she should leave as soon as possible. Number 33 further told the CS to telephone him upon his/her arrival in Houston. On July 9, 2007, the CS contacted Number 33 via telephone and requested funds from him in order to complete the transportation of the MDMA.

On July 10, 2007, ICE agents from the Houston Narcotics Smuggling Group, and from Michigan, initiated a controlled delivery at the Comfort Inn located at 5820 Katy Freeway, in Houston. The CS initiated several telephone calls with Number 33, who had changed to Number 65. Number 33/65 advised the CS he would be arriving at the hotel. At approximately 10:00 a.m., agents observed the CS speaking with a person driving a white Chevrolet pickup truck, bearing Texas license plate number 9TZ-V50, in the parking lot of the Comfort Inn. A records query of the license plate revealed that the pickup truck was registered to Alan and Rena Klentz, in Houston. A short time later, agents observed a white female, who was the driver of the pickup truck, enter a room with the CS and attempt to remove one of the bags of MDMA. Agents arrested the female on the premises of the Comfort Inn. She was identified as Rena Blake Klentz.

After Klentz was read her Miranda Rights, she agreed to speak with agents. Klentz advised that she was hired to pick up the packages for a man named Tom (LNU). Klentz agreed to help agents in a second controlled delivery of the MDMA. Klentz then contacted Tom LNU via telephone, at the request of agents. During the phone call, Tom LNU directed Klentz to take the MDMA to her house, and that he would retrieve the bags containing MDMA at a later time.

Several phone calls were subsequently made to Tom LNU, who stated he would send somebody to retrieve the MDMA. At about 2:00 p.m., ICE agents requested Klentz telephone Tom LNU again. Klentz telephoned Tom LNU and told him she could no longer wait. Tom LNU directed Klentz to take the bags of MDMA with her to his friend's house.

3

At approximately 3:30 p.m., Klentz drove her pickup truck to 9531 Red Maple. Klentz later identified 9531 Red Maple, in Houston, as being the house that Tom LNU had told her about, and where she had taken packages for him on prior occasions. At this time, a male exited the house and began removing the bags of MDMA from the vehicle. ICE agents arrived, and while the male was in the process of removing the bags from the vehicle, arrested him. The male was identified as Thang Dinh Ngo. When asked if anyone else was in the home, Ngo responded that one person was in the house.

At that time, agents observed that the front door of the house was open. Simultaneously, agents also heard what sounded like someone running toward the back of the house. Agents went to the front door and observed what appeared to be kilogram bricks of cocaine lying near the front door. Agents arrested Khamphouthong Sayavongsa as he ran out the back door. Sayavongsa was read his Miranda Rights, at which time he agreed to speak with agents. Sayavongsa told agents the cocaine did not belong to him, but that he had agreed to let Ngo store the cocaine at his house. Agents later field-tested the bricks and received a positive indication for the presence of cocaine.

Sayavongsa agreed in writing to a consent search of the residence. Agents discovered in the residence approximately 10,000 MDMA tablets, and $14,000 in a rubber band bundle. A field-test revealed the presence of MDMA in the suspected tablets. Sayavongsa was asked if he sold cocaine based on the presence of several scales and packaging paraphernalia in the house. Sayavongsa stated he had sold cocaine up to six months prior, but had quit. Sayavongsa was also asked if he sold MDMA based on the discovery of the additional tablets found. Sayavongsa stated he knew the tablets were in the house, but asserted he had allowed Ngo to store them there.

After Ngo read his Miranda Rights, he agreed to speak with agents. Ngo stated he had been involved with arranging the distribution of MDMA since the week after Memorial Day 2007. Ngo stated he had been responsible for arranging the transfer of four separate loads of MDMA from Houston to Dallas, Texas. Ngo stated the loads of MDMA came approximately every month. Ngo further stated that each load contained between one to three bags that weighed approximately the same weight (20 kilograms) as the bags that had been delivered earlier in the day. Ngo stated the cocaine in the house was

4

his responsibility. Ngo stated he was told to set up the delivery of the cocaine to the same people in Dallas that the MDMA was to be delivered. Ngo stated on each of the four trips, he would contact Klentz and arrange for Klentz to pick up the MDMA somewhere in the East Texas area, and either deliver the MDMA to Ngo or keep it at her home until he could arrange for the transfer to Dallas. Ngo added that Klentz had also picked up the cocaine in Beaumont on July 7, 2007, and that he had picked it up from Klentz' home on that same day. Agents advised that Ngo's statement concerning Klentz' involvement in the cocaine could not be corroborated.

Klentz related she had picked up those types of packages several times before for Tom LNU. Klentz advised agents that she was paid between $1,000 and $1,500 per trip to retrieve the packages. Klentz stated she would sometimes take the packages to Tom LNU, or sometimes take the packages to her house, where Tom LNU would pick them up. Klentz had in her vehicle an envelope containing $1,000 in cash. Klentz reported she had picked up the money at a residence in the Spring Branch area earlier that day at the request of Tom LNU. Klentz stated she was instructed by Tom LNU to give the $1,000 cash to the CS.

According to a DEA laboratory analysis, the total amount of cocaine seized on July 10, 2007, had a net weight of 20.1 kilograms.

According to a DEA laboratory analysis, the total amount of MDMA seized on July 10, 2007, had a net weight of approximately 61.6 kilograms of MDMA.

Based on the Drug Equivalency Tables, 1 gram of cocaine is equivalent to 200 grams of marijuana; therefore, the amount of cocaine seized in this case represents 4,020 kilograms of marijuana. Based on the Drug Equivalency Tables, 1 gram of MDMA represents 500 grams of marijuana; therefore, the amount of MDMA seized in this case represents 30,800 kilograms of marijuana.

Based on the statements of Ngo and Klentz, it was determined they were involved in the transportation of three additional MDMA loads. According to the statements, the MDMA loads were of similar size (between 1 and 3 bags, and weighing approximately 60 kilograms), with the exception of the first trip which was reported to be smaller. In an abundance of caution, only

5

one bag per load of MDMA will be used for the purposes of determining additional relevant conduct. The average net weight of the seized MDMA was approximately 24 kilograms per bag. In further abundance of caution, a net weight of 10 kilograms of MDMA per bag will be used for three additional bags of MDMA, for a total of 30 kilograms (equivalency of 15,000 kilograms of marijuana). This is considered a very conservative figure in light of the fact that as many as three bags of MDMA may have been transported on three previous occasions, representing a possible total of nine additional bags. It is noted this additional relevant conduct has no impact on the guideline calculations, as the amount seized is sufficient to establish a maximum base offense level of 38 under the drug quantity table.

(Docket Entry No. 127, PSR, pp. 5–7.) The revised PSR disclosed "Defendant's Relevant

Conduct" as follows:

Thanh Dinh Ngo is responsible for a total marijuana equivalency of 49,820 kilograms. This represents the seizure of MDMA and cocaine that occurred on July 10, 2007, as well as the additional relevant conduct determined by statements both he, and co-defendant Klentz, made to law enforcement authorities. Ngo is deemed a manager/supervisor in this criminal conspiracy that involved five or more criminal participants. In addition to the three indicted participants, agents advised that once the MDMA arrived in Houston, there were at least two additional individuals who helped further distribute the MDMA, as well as an unidentified 'boss.' Ngo was responsible for overseeing the distribution of MDMA and cocaine once it arrived in Houston, to other areas, *i.e.*, Dallas, Texas. Additionally, he oversaw the arrival of MDMA in Houston through his management and/or supervision of Klentz, whom he paid directly for her services as a courier for the organization. While the MDMA was imported from Canada, there is not sufficient evidence to indicate Ngo was aware the MDMA was imported.

*Id.*, pp. 5–8. Defendant pleaded guilty based on these factual statements.

Defendant's co-defendant, Khamphouthong Sayavongsa, proceeded to trial shortly

after Defendant's sentencing. Defendant argues that, during the trial, evidence showed that

20,000 tablets (6 kilograms) of MDMA were seized in Detroit destined for Houston, and

6

that the remainder of the MDMA was shipped from a source in Canada directly to U.S. Customs and Border Protection at the request of that agency, for use in a controlled delivery. This evidence forms the basis for all of Defendant's claims raised herein.

### *Analysis*

Defendant argues that the original amount of MDMA intercepted in Detroit that was en route to him in Houston was only 20,000 tablets, which would have weighed approximately six kilograms. He asserts that the Government added more tablets to the load after it was intercepted in Detroit, such that 61 kilograms of MDMA were delivered to Defendant in Houston. Defendant states that this increase in the drug amount was made without his knowledge or involvement, and he was unaware during his plea and sentencing that the Government itself had increased the weight of the drug following inception and prior to delivery to him.

Defendant further argues that the Government lied in the PSR regarding the amount of drug intercepted in Detroit, and failed to disclose that the amount of the drug had been augmented by federal agents during transport to Defendant in Houston. In support, Defendant directs the Court to the following statement appearing in the revised PSR:

> Based on the statements of [Defendant] and [co-defendant] Klentz, it was determined that they were involved in the transportation of three additional MDMA loads. According to the statements, the MDMA loads were of similar size (between 1 and 3 bags, and weighing approximately 60 kilograms), with the exception of the first trip which was reported to be smaller. In an abundance of caution, only one bag per load of MDMA will be used for the purposes of determining the additional relevant conduct. The average net

7

> weight of the seized MDMA was approximately 24 kilograms per bag.  In further abundance of caution, a net weight of 10 kilograms of MDMA per bag will be used for three additional bags of MDMA, for a total of 30 kilograms. . . . This is considered a very conservative figure in light of the fact that as many as three bags of MDMA may have been transported on three previous occasions, representing a possible total of nine additional bags.

(Docket No. 127, p. 6.)  Defendant argues that the Government violated his constitutional rights by adding additional MDMA product to the intended delivery without his knowledge or consent, which increased his sentencing exposure.

The Government argues, and the record shows, that after Defendant was arrested and his Miranda rights were read, he agreed to speak with government agents.  Defendant informed them that he had been involved in the distribution of MDMA since 2007, and that he had been responsible for arranging the transfer of four separate loads of MDMA from Houston to Dallas. (Docket Entry No. 127, PSR, p. 6.)  He further stated that each load contained one to three bags that weighed approximately the same weight, twenty kilograms. *Id.*  The Government states that Defendant did not contest the weight determination at any point, from pretrial through sentencing and appeal.

Defendant claims that the Government's actions constitute sentencing entrapment or sentencing factor manipulation.  Sentencing manipulation or sentencing factor manipulation occurs when "a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment." *United States v. Snow*, 309 F.3d 294, 295 (5th Cir. 2002).  To prevail on such argument, a defendant must

8

demonstrate "outrageous official misconduct [that] overcomes the will of an individual predisposed only to dealing in small quantities for the purpose of increasing the amount of drugs . . . and the resulting sentence of the entrapped defendant." *Id.*

Defendant concedes that the Fifth Circuit Court of Appeals has not recognized sentencing entrapment or sentence factor manipulation as cognizable habeas claims. As stated by the Fifth Circuit in *Snow*,

> This court has not had to determine whether sentencing entrapment is a cognizable defense to a sentence. *United States v. Washington*, 44 F.3d 1271, 1280 n. 28 (5th Cir. 1995). However, even if it were considered here, [Defendant] has failed to show that the government agent persuaded [him] to commit a greater criminal offense than he was predisposed to commit or that the agent's conduct was outrageous, resulting in sentencing factor manipulation. *See United States v. Sanchez*, 138 F.3d 1410, 1414 (11th Cir. 998).

309 F.3d at 295.

Even assuming sentencing entrapment or sentence factor manipulation were cognizable habeas claims in this circuit, Defendant fails to meet his burden of proof as to the claims. Defendant admits that each of the four MDMA loads he arranged and/or accepted for distribution from Houston to Dallas contained one to three bags that weighed approximately the same weight, twenty kilograms. The total amount of MDMA seized on July 10, 2007, had a net weight of approximately 61.6 kilograms. This amount was not substantially more than the amounts involved in Defendant's prior transports, and the record does not show that Defendant was predisposed only to dealing in small quantities and that

9

the Government's actions overcame the will of Defendant for the purpose of increasing the amount of drugs.  No sentencing manipulation or entrapment is shown.

The Fifth Circuit reviews the complaint raised by Defendant under a due process test to determine if the government impermissibly manipulated the amount of drugs.  Defendant argues that the Government here denied him due process and violated the separation of powers doctrine by "manipulating the quantity of drugs in a sting operation for the purpose of creating greater sentence exposure," citing *United States v. Richardson*, 925 F.2d 112 (5th Cir. 1991).  In *Richardson*, the Fifth Circuit noted as follows:

> We turn, finally, to the constitutional issues raised by both Richardson and Boudreaux.  Boudreaux argues that under the Guidelines, the power of the executive branch to determine a defendant's sentence based on the amount of money that undercover agents bring to the table in a 'sting' operation violates the separation of powers doctrine.  We agree that if the executive branch had the unilateral power to directly and automatically ratchet up a sentence through these means, one might then argue that such power could constitute the sort of threat to the 'authority and independence' of the judicial branch that the Supreme Court referred to as constitutionally infirm in *Mistretta v. United States*, 488 U.S. 361 (1989).

> In this case, however, we do not find the 'undue accretion of power to the Executive branch' alleged by Boudreaux, because the district court clearly retained the authority to find that the amount of money brought to the table was not legitimately part of the laundering conspiracy and was not, therefore, 'relevant conduct.'  Although the Guidelines state that 'relevant conduct' of a defendant must be considered in calculating a sentence, the Guidelines leave the judge with enough discretion to determine, for example, whether the conduct in question was 'counseled, commanded, induced, procured, or willfully caused' by the defendant.  U.S.S.G. § 1B1.3, comment. (n. 1).

925 F.2d at 117.  No violation of the separation of powers clause was found.

10

Here, the record shows that the weight of the MDMA attributed to Defendant was within the range for the conduct admitted by Defendant, and the Government is not shown to have exercised any unilateral power that directly and automatically acted to ratchet up Defendant's sentence.   The Government's augmentation of the MDMA delivery to Defendant did not exceed his prior conduct, and was not shown to be either outside the scope of his agreement with his sources or not reasonably foreseeable in connection with the criminal activity he agreed to jointly undertake with his sources. *See* U.S.S.G. § 1B1.3, comment. (n. 1).  Indeed, Defendant did not raise any complaints or otherwise contest the weight of the MDMA involved in his case.[1]  In short, Defendant does not demonstrate that his offense level was directly attributable to, or unilaterally controlled by, the Government's conduct, and no violation of the separation of powers clause is shown.

For like reasons, Defendant fails to establish that the Government impermissibly manipulated the amount of drugs relevant to his case, and no due process violation is shown. Defendant fails to show that the Government "impermissibly manipulated" the amount of MDMA involved in his case, in that the amount of seized drug fell within the range of the

---

[1]Defendant counters that he could not dispute the weight because he was unaware of the Government's alleged "ten-fold" augmentation of the weight until after his plea and sentencing. Defendant's argument misses the mark. If the weight of the MDMA was, indeed, ten times beyond what he had agreed to transport or arranged for transport, *regardless* of its source, the time to raise that complaint was prior to the Court's acceptance of his guilty plea or its pronouncement of sentence. Defendant, however, raised no such complaint to this Court, and his lack of complaint strongly indicates that the weight of the seized drug had *not* exceeded by a factor of ten the scope of his agreed criminal involvement.

other drug loads he accepted for transport and distribution. Moreover, as previously noted,

Defendant voiced no complaints to this Court that the weight of the MDMA exceeded by

ten times the scope of his agreed criminal activity. To the contrary, he informed this Court

that the Government's allegations regarding the MDMA – including his involvement in

other drug loads and the weight of those loads – were true and that he was guilty of the

criminal conduct alleged by the Government. No due process violation is shown. *See*

*Richardson*, 925 F.2d at 118 ("Given the defendants' knowledge and acceptance of the

amount of funds involved in the laundering conspiracy, we find no violation of due process

in the inclusion of this amount for sentencing purposes.").

Defendant fares no better on his claim that the Government denied him due process

and violated *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing exculpatory evidence

material to punishment. In addressing a *Brady* claim, the Fifth Circuit has explained that

a defendant must prove that (1) the prosecution suppressed evidence; (2) the suppressed

evidence was favorable to the defense; and (3) the suppressed evidence was material to guilt

or punishment. *Derden v. McNeel*, 938 F.2d 605, 617 (5th Cir. 1991). The test for

materiality is whether there is a "reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different." *Id.*

Defendant argues that the Government suppressed evidence concerning the origin

of the 61 kilograms of MDMA for which he was held accountable. Specifically, he states

that the PSR reported that the 61 kilograms were seized in Detroit, that it "was subsequently

12

learned that the MDMA originated from Canada," and that the drugs were "destined to unknown individuals in Houston, Texas." Defendant complains that only after his sentencing, did federal agents reveal that only 20,000 tablets of the MDMA (approximately 6 kilograms) had been seized in Detroit destined for Houston, and that the 61 kilograms were shipped from a source in Canada directly to U.S. Customs and Border Protection agents for use in the controlled delivery involving Defendant.

In claiming that the evidence was exculpatory and material to his sentence, Defendant argues the evidence proved that, although he was predisposed to commit a minor or lesser offense, the Government entrapped him into committing a greater offense subject to a greater sentence. However, this Court has already rejected Defendant's underlying claims of sentencing entrapment, sentencing factor manipulation, and denial of due process; accordingly, no *Brady* violation is shown.

In his final claim, Defendant argues that this Court denied him due process by relying on false, material information in determining his sentence. A sentence based upon erroneous material information violates due process, *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. 1981), and a defendant is entitled to re-sentencing upon showing that the district court relied on materially untrue information. *United States v. Flores*, 875 F.2d 1110, 1113 (5th Cir. 1989).

This claim constitutes an additional permutation of the arguments already raised to, and rejected by, the Court in this motion. For the reasons already discussed, Defendant does

13

not demonstrate that the allegedly untrue or incomplete information regarding the source of the MDMA or location of its seizure was material to the determination of his sentence. Habeas relief is not warranted on this claim.

### *Conclusion*

The Government's motion to dismiss (Docket Entry No. 291) is GRANTED. Defendant's section 2255 motion (Docket Entry No. 273) is DENIED. A certificate of appealability is DENIED.

The Clerk of Court is ORDERED to ADMINISTRATIVELY CLOSE the corresponding civil case, C.A. No. H-10-4924.

Signed at Houston, Texas, on May **30**, 2013.

_____
Gray H. Miller
United States District Judge

14